# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**NICHOLAS KARVELAS,**

                Plaintiff,

       -vs-                                                       Case No. 09-C-771

**MILWAUKEE COUNTY, GERI LYDAY, and
JOHN CHIANELLI,**

                Defendants.

## DECISION AND ORDER

Nicholas Karvelas is a severely disabled adult with a genetic disorder known as 9q34.3 Subtelomeric Deletion Syndrome. By his guardian ad litem, Karvelas alleges that his temporary placement in a short-term observation unit operated by Milwaukee County violated his rights under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Wisconsin Mental Health Act. The defendants move for summary judgment. For the reasons that follow, this motion is granted.

### BACKGROUND

Karvelas's date of birth is October 27, 1987. As a result of his genetic disorder, Karvelas is severely developmentally disabled. He functions cognitively at the level of a two- or three-year-old child. Karvelas is not able to communicate through the spoken word. He needs help eating, clothing himself, washing and bathing himself, and he is incontinent. Karvelas uses a wheelchair, and he has never been able to stand and bear his own weight independently. Prior to April 2008, Karvelas had always lived at home, and his mother

never considered removing him from her care prior to the spring of 2008. Karvelas's mother is a nurse, and his stepfather is a special education teacher.

On April 2, 2008, Karvelas was voluntarily admitted to the Observation Unit at the Milwaukee County Mental Health Complex in Wauwatosa, Wisconsin. The Observation Unit is typically used for short-term care and treatment of psychiatric patients with the goal of stabilizing their mental health conditions so that they can return to their long-term residential arrangements in the community or elsewhere. The Observation Unit can house up to 18 patients. It is staffed by certified nursing assistants, nurses, social workers, and physicians.

At the time of his admission to the Observation Unit, Karvelas was twenty years old. In the six-month period before admission, Karvelas engaged in aggressive yelling and screaming behaviors that included biting himself and picking his nose to the point of causing bleeding. His tantrums would last for several hours at a time. Karvelas would also crawl around the house, knocking over garbage cans, furniture, and other items that were within his reach on the floor. Karvelas exhibited similar behaviors at school in the six months prior to his admission to the Observation Unit. According to his mother, Karvelas was essentially screaming all day long, both at home and at school. Karvelas was prescribed Risperdal for his behavioral issues beginning in March 2008 by his private physician.

Karvelas's parents reached their wits end after a tantrum on the evening of April 2, 2008. They decided to take him to the Milwaukee County Mental Health Complex after doing an internet search on their home computer. Karvelas's parents had no prior knowledge

-2-

Case 2:09-cv-00771-RTR    Filed 09/05/12    Page 2 of 14    Document 57

of the fact that Milwaukee County's Behavioral Health Division ("BHD") had in-patient facilities for psychiatric patients. Other than telephoning a general information line with the Milwaukee County Department of Health and Human Services, Karvelas's parents never specifically communicated with Milwaukee County about the prospect of obtaining a residential placement for Karvelas outside of their home prior to his admission to the Observation Unit. Karvelas's parents voluntarily admitted him to the Observation Unit because they felt they could not take care of him any more due to his behavioral outbursts.

At the time of his admission, Karvelas's "Psychiatric Crisis Service/Admission Center Assessment" stated as follows:

> PT nonverbal. Is self abusive. 20 y/o behavior had been declining over the last 1-3 months since puberty started. PT has been screaming nonstop for hours. FMLH unable to find anything medically wrong. Family is at their wits end. They don't know how to deal with it any more. Family has #2 other children. Father says he's afraid he'll hurt PT. They need a respite & some help.

According to his mother, this was an accurate description of what she and her husband were telling staff at BHD when they voluntarily admitted their son. Karvelas's mother signed an informed consent to his receipt of psychotropic medications, including an increase in the dosage of his Risperdal prescription.

On April 10, 2008, the medical staff at BHD concluded that Karvelas was clinically ready for discharge from the Observation Unit. As a result, a meeting was held at BHD to discuss Karvelas's future residential placement. Staff from BHD and Milwaukee County's Disability Services Division ("DSD") were present, along with representatives of the Franklin Public School District, Karvelas, his parents, and a family priest. At the meeting,
-3-

County representatives informed Karvelas's parents that he was ready for discharge from the Observation Unit and back into their care at home. County representatives also indicated that additional in-home supports could be provided and paid for by the County to help them care for Karvelas in their home, including in-home respite services and an after school day care program. Karvelas's parents stated that they would not agree to allow Karvelas to return home due to their concern that his behavioral problems might recur and escalate to the point where Karvelas would physically harm himself or other family members. Karvelas's priest stated that he was concerned that "something unfortunate" might happen if Karvelas returned home. Therefore, Karvelas's parents informed the County representatives that they needed to find a long-term residential placement outside of their home.

DSD representatives indicated that they would make referrals and search for a long-term residential placement. County representatives informed Karvelas's parents that the waiting list at the time for long-term adult support services (including such a residential placement) contained between 2,000 and 3,000 people, and that it was regularly taking between five and ten years to move individuals off the wait list for such services. Karvelas's parents understood that he would remain in the Observation Unit until the County could find a long-term residential placement for him. They also understood that, because of their demands, Karvelas would be moving up on the wait list for long-term support services and that he would be receiving a long-term residential placement faster than he otherwise would have on the waiting list.

DSD staff pursued a long-term placement in a supported apartment in which Karvelas could receive 24-hour staff support every day. This involved canvassing the residential providers with whom Milwaukee County contracted to determine those who might have an available apartment that would be suitable for Karvelas. On April 11, 2008, DSD staff provided Karvelas's case summary to Moore Cares, a residential provider who is contracted with the County.

On April 18, 2008, County representatives suggested to Karvelas's parents that he might be temporarily placed at Hilltop, a residential long-term care facility for individuals with developmental disabilities operated by the County at the County's Mental Health Complex. Karvelas's parents were given the opportunity to visit the unit to determine whether they would allow such a placement. They chose not to visit and ultimately refused to allow placement at Hilltop.

Karvelas's parents were able to meet with the staff of Moore Cares, visit the apartment that was planned for Karvelas, and make renovations to the apartment. On May 2, 2008, representatives of DSD met with Karvelas's parents to complete the necessary documentation to obtain a Medicaid waiver slot for Karvelas so that funding would be in place for his anticipated long-term residential placement. In addition, Karvelas and his parents made a home visit to a Moore Cares facility. On May 6, 2008, representatives of DSD forwarded Karvelas's Medicaid waiver application to officials with the State of Wisconsin for approval. On May 22, 2008, a staffing meeting was held with representatives of Moore Cares to discuss Karvelas's transition from the Observation Unit to the Moore

Cares facility once the necessary funding approvals were obtained from the state. On May 24, 2008, the County received approval from the state for Karvelas's Medicaid waiver slot.

On June 4, 2008, Karvelas was discharged from the Observation Unit to his residential facility with Moore Cares. At the time of his discharge, Karvelas's parents informed a staff psychiatrist at BHD that they were grateful for the assistance provided by BHD staff during his admission and that they were very pleased with how the staff had cared for Karvelas during his admission. Karvelas has remained in his community living placement through Moore Cares. His parents are satisfied with and do not have any issues or concerns about Karvelas's residential placement through Moore Cares.

## ANALYSIS

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003).

As noted, Karvelas frames this case in the context of his temporary placement in BHD's Observation Unit while awaiting long-term residential placement. According to his physician, Karvelas's ability to stand, walk, feed himself, and swallow were adversely impacted due to his extended stay at the Observation Unit. Karvelas argues that he should have been allowed to stay at the Silverlawn Crisis Respite House ("CRH"), a Community Based Residential Facility (CBRF). At the time of his placement, the Silverlawn CRH was maintained by DSD to provide housing to individuals with developmental disabilities or mental health diagnoses (or both) who were in need of immediate, short-term housing due to a crisis situation such as a loss of housing or major care provider. The CRH was intended to divert individuals with developmental disabilities or mental health diagnoses from being admitted to BHD's in-patient facilities or, if admitted, to shorten the length of their stay in BHD's in-patient facilities.

Title II of the ADA[1] provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity . . ." 42 U.S.C. § 12132. The implementing regulations include an "integration mandate," which requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). "Under this mandate, states are required to provide care in integrated environments for as many disabled

---

[1] The Rehabilitation Act standards are essentially the same as those applied under Title II of the ADA, so it is unnecessary to distinguish between the two claims for purposes of this motion. *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004).

-7-

persons as is reasonably feasible, so long as such an environment is appropriate to their mental-health needs." *Arc of Wash. State, Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005). Accordingly, a public entity must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

The Supreme Court has held that the unjustified isolation of persons with mental disabilities is "properly regarded as discrimination based on disability." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999). However, this must be balanced against the government's "need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand." *Id.* If the County can demonstrate that it has a "comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met." *Id.* at 605-06. Such is the case here. The undisputed facts demonstrate that the County has a plan in place that worked to near perfection with regard to Karvelas's speedy placement in an appropriate, non-institutional setting. The fact that it did not occur as fast as the Karvelases would have liked does not meet the standard of discrimination on account of disability. *Id.* at 606 ("asking [a] person to wait a short time until a community bed is available . . . does

-8-

not exclude [that] person by reason of disability"); *Sanchez v. Johnson*, 416 F.3d 1051, 1068 (9th Cir. 2005) (the ADA "does not require the immediate, state-wide deinstitutionalization of all eligible developmentally disabled persons, nor that a State's plan be always and in all cases successful").

Karvelas persists by arguing that he is not challenging the entire funding system for placing people with developmental disabilities, only the referral process for CRH. Put another way, Karvelas argues that the County's refusal or failure to place him at CRH was unfair discrimination due to the severity of his disability. However, Karvelas's request for services cannot be viewed in isolation because the County has an obligation to "maintain a range of facilities and to administer services with an even hand . . ." *Olmstead* at 605. Rather, the request must be viewed in the context of the facilities that are reasonably available at the relevant time period. CRH Silverlawn was licensed as a "Class A Ambulatory" CBRF, meaning that it was only for ambulatory residents who are mentally and physically capable of responding to a fire alarm by exiting without any help or verbal or physical prompting. Therefore, making CRH Silverlawn available for Karvelas would have been a fundamental alteration of that facility and its services. The fact that it was not available for Karvelas at the time of his intake is simply a byproduct of the County's duty to provide care for a large population of mentally disabled individuals, not the result of discriminatory animus. "Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the

-9-

responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental diseases." *Olmstead* at 604.[2]

Even if Karvelas could show unlawful discrimination, he would not be entitled to relief on his claims. With respect to monetary damages, Karvelas must go further and prove that the County acted with deliberate indifference. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). Deliberate indifference requires "both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id.* The failure to act must be "a result of conduct that is more than negligent, and involves an element of deliberateness." *Id.* (citing *Bartlett v. N.Y. State Bd. of Law Exam'r*, 156 F.3d 321, 331 (2d Cir. 1998) (reversed on other grounds). Karvelas's narrow complaint that the County failed to place him at CRH ignores all that the County did do for him: move him to the top of the waiting list, help him apply for a Medicaid waiver, and arrange for placement at a Moore Cares facility, all within the span of eight weeks. On top of that, the County offered alternatives to the inpatient treatment at the Observation Unit, including in-home assistance and placement at Hilltop. The undisputed facts demonstrate that the County went out of its way to help Karvelas, not that they were deliberately indifferent to his needs.[3]

---

[2] Karvelas also argues that he could have stayed at the Lisbon House. The Lisbon House is the new CRH facility, but it was not available at the time of Karvelas's placement. ECF No. 56, Defendant's Response to Plaintiff's Proposed Findings of Fact, ¶ 20. The Lisbon House was not and still is not fully wheelchair accessible in any event. ECF No. 28, Defendant's Proposed Findings of Fact, ¶ 32.

[3] Karvelas also requests injunctive relief on the grounds that he continues to engage in serious behaviors that challenge his parents and his paid caregivers, and he might require crisis respite services once again. The County has identified the need for a service provider to ensure that the current CRH facility is wheelchair accessible, so it appears that the issue is in the process of being remedied ECF No. 28, Defendant's Proposed Findings of Fact, ¶¶ 38-44. In any event, Karvelas lacks standing based on the speculative possibility that he may need to use a CRH at some point in the future. *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) ("standing exists only if it is 'likely,' as opposed to merely
(continued...)

-10-

Finally, Karvelas argues that he can survive summary judgment because the County violated 28 C.F.R. § 35.149. As an initial matter, Karvelas admits that he never pled a claim under § 35.149, and a complaint cannot be amended in response to a motion for summary judgment. *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758 n.15 (7th Cir. 2006).

Even on its merits, the County would be entitled to summary judgment on this claim. § 35.149 provides that "[e]xcept as otherwise provided in § 35.150, no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." The reference to § 35.150 incorporates a general duty to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 U.S.C. § 35.150(a). A public entity can comply with this general requirement in a variety of ways, including, as relevant here, "home visits" and the "delivery of services at alternate accessible sites." § 35.150(b). Both of these options were offered to Karvelas, but his parents simply refused them. The mere fact that CRH was not accessible for Karvelas does not also mean that the services provided there were inaccessible to him. "Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to

---

[3](...continued)
'speculative,' that the injury will be 'redressed by a favorable decision'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6 (1st Cir. 2000); *see also Frame v. City of Arlington*, 657 F.3d 215, 246 (5th Cir. 2011) (Jolly, J., dissenting) ("under § 35.149, a city violates the law by having inaccessible facilities *only if* those facilities deny disabled individuals access to a service") (emphasis in original).

Moreover, and for the reasons already stated, the County was not required to suddenly change the CRH into a wheelchair-accessible facility because doing so would result in a fundamental alteration of its services at that location. § 35.150(a)(3) (public entity need not "take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens"). Karvelas argues that the County cannot claim fundamental alteration because the County did not comply with the following language in the regulation: "The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and *must be accompanied by a written statement of the reasons for reaching that conclusion*." *Id.* (emphasis added). This argument is disingenuous because Karvelas's parents never specifically requested placement at CRH. It is true that a request for accommodation may not be required when the need is obvious, *Robertson v. Las Animas Cnty. Sheriff's Dept.*, 500 F.3d 1185, 1197 (10th Cir. 2007) (collecting cases), but this line of cases seems beside the point when the plaintiff requests accommodation and the

defendant goes out of its way to pursue the best possible accommodation on short notice. Stated another way, the specific need for placement at CRH was not "obvious" because CRH was not suitable for a non-ambulatory individual. The County should not be punished for quickly eliminating a non-starter option that was never requested by the plaintiff in the first instance.

For the foregoing reasons, the County is entitled to summary judgment on Karvelas's claims under the ADA and the Rehabilitation Act. All that remains is his claim under the Wisconsin Mental Health Act, Wis. Stat. § 51.61. Since the federal claims have all been dismissed, the typical route is to relinquish jurisdiction over a pendent state law claim. 28 U.S.C. § 1367(c)(3). One exception is when it is "obvious how the claims should be decided." *Williams Elec. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). If "an interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case." *Van Harken v. City of Chi.*, 103 F.3d 1346, 1354 (7th Cir. 1997).

The Mental Health Act provides that patients have the right to be held in the "least restrictive conditions necessary to achieve the purposes of admission" and the right to "prompt and adequate treatment, rehabilitation and educational services appropriate to [their] condition, under programs, services, and resources that the county board of supervisors is reasonably able to provide within the limits of available state and federal funds and of county funds required to be appropriated to match state funds." Wis. Stats. §§ 51.61(1)(e), (f). The

discussion in this opinion demonstrates that Karvelas received the least restrictive placement and prompt and adequate treatment under the programs, services, and resources that the County was reasonably able to provide within the limits of available funding. *See, e.g., In re Guardianship of Judy K.*, 647 N.W. 2d 799, 806 (Wis. 2002) (with respect to protective placements, County must make a "good faith, reasonable effort to find and fund an appropriate placement"). Therefore, the Court will retain jurisdiction over this claim and enter judgment in favor of the County.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. The defendants' motion for summary judgment [ECF No. 23] is **GRANTED**; and

2. This matter is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 5th day of September, 2012.

                                      **BY THE COURT:**

                                      _____
                                      **HON. RUDOLPH T. RANDA
                                      U.S. District Judge**